## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| **MIKEL EDWARD SATCHER,** | ) | **Chapter 7** |
| | ) | **Case No. 05-24716-JEB** |
| Debtor | ) | |
| | ) | |
| **MIKEL EDWARD SATCHER,** | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | **Adversary Proceeding** |
| | ) | **No. 18-01189-JEB** |
| **EDUCATIONAL CREDIT** | ) | |
| **MANAGEMENT CORPORATION,** | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |

## MEMORANDUM OF DECISION

This matter came before the Court on the amended complaint filed by the plaintiff,

chapter 7 debtor Mikel E. Satcher (the "Debtor") against the defendant Educational Credit

Management Corporation ("ECMC"). Pursuant to the amended complaint, the Debtor seeks a

determination under Section 523(a)(8) of the Code that his student loan obligations to ECMC are

discharged because excepting the debt from discharge would impose an undue hardship on him.

For the reasons set forth below, the Court finds that the student loan debt of the Debtor to ECMC

is discharged.

This Memorandum of Decision constitutes the findings of fact and conclusions of law

pursuant to Fed. R. Civ. P. 52(a), made applicable to this proceeding by Fed. R. Bankr. P. 7052.

The findings set forth in this Memorandum are based on the record as a whole and may be

supported by testimony and exhibits that are not specifically cited. Any finding of fact deemed a

conclusion of law is adopted as such, and vice-versa. Findings of fact may also be set forth in the
Analysis section in connection with the application of the law.

## PROCEDURAL HISTORY

The Debtor, acting *pro se*, filed the petition commencing the present bankruptcy case on
October 14, 2005. The Debtor received a discharge under Section 727(b) of the Code on
March 22, 2006, and the case was closed. In 2018, the Court granted the Debtor's motion to
reopen the case to permit him to commence this adversary proceeding.

After filing the initial complaint, the Debtor subsequently filed amended complaints to
address issues raised in orders of the Court and motions to dismiss filed by certain defendants.
On July 25, 2019, the Debtor filed a further amended complaint ("Amended Complaint") seeking
relief against four defendants, including Ascendium Education Solutions, Inc. Pursuant to the
Amended Complaint, the Debtor seeks a determination that the Debtor's student loan obligations
to the defendants are discharged under Section 523(a)(8) of the Code because repayment of those
loans would impose an undue hardship on the Debtor. ECMC, as holder by assignment of the
student loan debt held by Ascendium, moved to intervene and be substituted as party defendant
for Ascendium. By separate orders, the Court granted the motion of ECMC to intervene and
dismissed the claims against the remaining defendants. Accordingly, ECMC remains the sole
defendant. The Amended Complaint is the operative complaint.

The Court conducted an evidentiary trial on the Amended Complaint by video on
June 9, 2021. After trial, the parties submitted proposed findings of fact and conclusions of law.

After the matter was taken under advisement, the Debtor filed a document labeled
"Notice of Additional Authority" in which he provided notice that he had been terminated from
his employment. ECMC filed a motion to strike the Notice. The Court has entered a separate

order granting the Motion to Strike. The order is without prejudice to the Debtor filing a motion

to reopen the evidence and ECMC to oppose such motion. Accordingly, the Court has not

considered the termination of the Debtor from his employment after the trial for purposes of this

decision.

### JURISDICTION

The Court has jurisdiction over the Complaint since it arises under Section 523 of the

Bankruptcy Code. 11 U.S.C. § 523. Pursuant to Section 1334(b) of title 28, the district courts

have jurisdiction of "all civil proceedings arising under title 11, or arising in or related to cases

under title 11," subject to exceptions not applicable here. 28 U.S.C. § 1334(b). By a standing

order of reference in accordance with 28 U.S.C. § 157(a), the district court in this district has

referred all cases under title 11 and any proceedings arising under, arising in, or related to cases

under title 11, to the bankruptcy court. *See* 28 U.S.C. § 157(a). The determination of the

dischargeability of a debt is a core proceeding in bankruptcy. 28 U.S.C. § 157(b)(2)(I).

Accordingly, this Court may hear and finally determine this matter.

### APPLICABLE LAW AND BURDEN OF PROOF

Section 523 of the Code sets forth the debts that are excepted from an individual debtor's

discharge. To ensure the continued viability of the student loan program, Congress has

determined that the discharge of student loan debt is the exception and not the rule. *In re Nash*,

446 F.3d 188, 191 (1st Cir. 2006). Consequently, under Section 523(a)(8) of the Code, certain

student loans are not discharged unless excepting the debt from discharge would impose an

undue hardship on the debtor and the debtor's dependents. 11 U.S.C. § 523(a)(8), *amended by*

11 U.S.C. § 523(a)(8) (BAPCPA 2005).[1] The exception applies to a debt "for an educational

benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under

any program funded in whole or in part by a governmental unit or nonprofit institution, or for an

obligation to repay funds received as an educational benefit, scholarship or stipend." *Id*.

The creditor bears the initial burden of establishing that the debt is of the type excepted

from discharge under Section 523(a)(8). *In re Bronsdon*, 435 B.R. 791, 796 (B.A.P. 1st Cir.

2010). The debtor has the burden of proof on the issue of undue hardship. *Id.* The standard of

proof is a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 287, 111 S. Ct. 654,

659 (1991).

The Court adopts the totality of circumstances test to determine whether the Debtor has

shown undue hardship. Since the Bankruptcy Code does not define "undue hardship," courts

have developed two alternative tests to address the issue. The Bankruptcy Appellate Panel for the

First Circuit and most courts in this District follow the totality of the circumstances test adopted

by the Eighth Circuit. *Bronsdon*, 435 B.R. at 800; *see also In re Carney*, No. 20-40723-CJP,

2023 WL 2576174, at *12 (Bankr. D. Mass. Mar. 20, 2023) and the cases cited therein. Under

this test, the court will consider

> (1) the debtor's past, present, and reasonably reliable future financial resources;
> (2) a calculation of the debtor's and her dependent's reasonable necessary living
> expenses; and (3) any other relevant facts and circumstances surrounding each
> particular bankruptcy case.

*In re Long*, 322 F.3d 549, 554 (8th Cir.2003). The key question under this test is: "Can the

debtor now, and in the foreseeable future, maintain a reasonable, minimal standard of living for

the debtor and the debtor's dependents and still afford to make payments on the debtor's student

---

[1] Since the 2005 amendments to the Bankruptcy Code did not apply to pending cases, the Code in
effect on October 14, 2005, the date the Debtor commenced the bankruptcy case, applies to this
Adversary Proceeding.

loans?" *In re Hicks*, 331 B.R. 18, 31 (Bankr. D. Mass. 2005). As more fully discussed in *Bronsdon*, the totality of circumstances test best balances the determination of undue hardship with the plain text of Section 523(a)(8). *Bronsdon*, 435 B.R. at 797-800. Although the First Circuit declined to adopt a particular test for undue hardship, it has recognized the use of "totality of circumstances" in connection with other provisions of the Code. *See Bronsdon*, 435 B.R. at 800 n.15.

In adopting the totality of circumstances test, the Court declines to utilize the *Brunner* test set forth by the Second Circuit. *Brunner v. New York State Higher Educ. Servs. Corp.*, 831 F.2d 395 (2d Cir. 1987). The *Brunner* test has been followed by the majority of courts, including eight other courts of appeal. *See, e.g., In re Frushour*, 433 F.3d 393, 400 (4th Cir. 2005). Under *Brunner*, to establish undue hardship, a debtor must show

> (1) that the debtor cannot maintain, based on current income and expenses, a 'minimal' standard of living for herself and her dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loans.

*Brunner*, 831 F.2d at 396. The *Brunner* test stretches too far beyond the plain language of the statute in requiring the debtor to show unique or extraordinary circumstances to "a certainty of hopelessness." *In re Hicks*, 331 B.R. at 31. "The debtor should not be obligated to prove a negative, that is, that he did not act in bad faith, and, consequently, acted in good faith." *Bronsdon*, 435 B.R. at 800.

Under the totality of circumstances test, the court still considers any disqualifying factors, such as bad faith. *Bronsdon*, 435 B.R. at 800. However, the burden is on the party opposing the discharge to present such evidence. *Id*.

The debtor's eligibility to participate in an income repayment plan is a factor considered by the court in determining undue hardship, but it is not conclusive. *Id*. Such programs

5

contemplate a payment over an extended period of time, such as 25 years, with payments based

on the debtor's income. At the conclusion of the term, the remaining debt is forgiven. Courts

must evaluate the benefits and drawbacks of such a program for the debtor's particular situation.

*In re Brooks*, 406 B.R. 382, 394–95 (Bankr. D. Minn. 2009). The deferral of payments may be a

benefit to a debtor with the prospect of increased income in the future *Bronsdon*, 435 B.R. at

800. But such plans also carry a downside since the debt may increase over time due to the

negative amortization and the debtor may face tax consequences in the future for debt

forgiveness. *Id.* Thus, a court must consider whether the program is a meaningful option in light

of the Debtor's individual financial situation.

### FINDINGS OF FACT

The following findings of fact are based on the testimony and the exhibits submitted at

trial. The Court has not included facts or background that are not relevant to this decision. The

Court has also not reconciled minor discrepancies, unless material or relevant to the rulings.

### The Debtor and His Family

The Debtor was 63 years old at the time of trial and will be 68 years old by the date of

this decision. His father was a sharecropper who left school in third grade to work in the fields,

and his mother completed twelfth grade. He is one of eight children, only two of whom received

college degrees. He inherited no wealth from his parents.

The Debtor married in 1990 and divorced in 2002. He is presently single. He has two

children from his marriage. At the time of trial in June 2021, his children were 26 and 23 years

of age.

Under the 2002 divorce agreement with his former spouse, the Debtor was obligated to

pay or otherwise provide for his children's support. This included the obligation to provide fifty

percent of his daughters' private school and college educational costs from kindergarten through college, including tuition and school supplies. These obligations have been a drain on the Debtor's resources in the intervening twenty years.

The Debtor's obligation to provide support for his children under the divorce agreement continues until the children become emancipated. The divorce agreement provided that "emancipation" varied depending on different events, including reaching the age of 23 and completing an undergraduate education. Although expressed as alternatives, the agreement also provided that emancipation would be the first to occur of the events. Each of his daughters has now attained the age of 23 years.

The Debtor contends that notwithstanding the terms of the divorce agreement, he remains obligated by love and parental duty to continue to provide for his children as they need it, to set them up in life as best he can. The Court finds that this belief is honestly held by the Debtor.

The Debtor also contends that his obligation to support his youngest daughter continues because of her health problems although his daughter is now 23 years old. Due to medical issues, his youngest daughter encountered delays in completing her undergraduate program and, at the time of trial, continued to work on that program. The Court finds that the Debtor's reading of the divorce agreement is plausible and the Debtor honestly understands this to be his obligation under the divorce agreement. Still, the Debtor has not established how much longer his daughter will require to complete her college education. Given the passage of time since the trial, the Court finds that by the date of this decision, any ongoing program will be at or near an end.

### The Debtor's Education

The Debtor graduated from high school in 1975. He then received a B.A. from Cornell University, but the evidence does not indicate his major area of study or when he received his

degree. He received three graduate degrees. The first graduate degree was a Master of Divinity

from Union Theological Seminary in New York City and the second degree a Master of Sacred

Theology (S.T.M.) from the same institution. The dates of these degrees are not in evidence. The

third graduate degree was a Ph.D. from Boston University's Graduate School of Arts and

Sciences. The Debtor commenced the Ph.D. program in 1987 and received his degree in 2002.

Again, the record does not indicate his area of concentration.

### The Student Loan Debt

The Court finds that the Debtor owes an outstanding student loan indebtedness, but given

the lack of evidence in the record, makes no finding as to the amount. ECMC provided a

statement that the total indebtedness on the student loans made to the Debtor was $723,157.89 as

of April 6, 2021. According to ECMC, the debt continues to accrue interest at 6.75 percent per

annum, or approximately $73.00 per day. The Debtor disputes the amount of this debt. The

Debtor does not deny that he is indebted in some amount, but he does not indicate that amount,

even within a range. The record includes no accounting of how many educational loans were

made to the Debtor, in what amounts, and when. Nor has any explanation been provided as to

how the total indebtedness has grown to its present total. Since the Debtor completed his last

degree in 2002, the Court finds that all of the loans were made no later than 2002.

### History of Employment, Income, Financial Insecurity, and Bankruptcy Filing

After graduating from Cornell, the Debtor worked at Chemical Bank in New York City,

where he trained and prepared to become the supervisor of the Foreign Service Desk that

approved money changes from all over the world. The years and duration of this employment are

not in evidence. He testified that he quit this job because the bank did not give him the

supervisory position for which he had been training, but instead gave the job to a more recent

hire whom he had trained and who was not a person of color.

The Debtor then took a civil service test to get trained as a patient escort or nursing assistant, just to get some employment and income. There is no evidence as to precisely when he did this and what employment, if any, came of this effort.

In the twelve years between graduation from high school in 1975 and commencement of his doctoral program in 1987, the Debtor had a full-time job for a total of just two years. There is no evidence of the nature of this employment or his earnings from it. In addition, during this period, the Debtor was homeless once for a month, in which he lived in a homeless shelter in New York City. The Debtor was also on public assistance once, although there is no evidence as to when, for how long, or the nature of the assistance.

In the thirty-four years from commencement of his doctoral program in September 1987 through the date of trial, June 9, 2021:

a.      The Debtor had a full-time job with benefits for a total of only seven years and three months, at Andover Newton Theological School and at Simmons University at the time of trial. For the remaining years, he was either unemployed or underemployed.

b.      He was forced out of his home three times during his marriage, for lack of sufficient funds to pay rent, leading to his wife's seeking the divorce that was finalized in 2002.

c.      He was homeless three other times: in 1998, after a failed attempt at marriage reconciliation; in 2014, after losing a job; and in 2018, after losing another job. Through all this period he owned no property. He had to rely on public assistance and religious charity to obtain housing.

      d.      He has held thirteen teaching positions in higher education, all in the nature of lecturer or adjunct lecturer, such that his employment was for a course or two at a time, not full time. The institutions at which he held these positions included Andover Newton Theological School, Boston University, Cape Cod Community College, Roxbury Community College, University of Massachusetts at Dartmouth, Merrimack College, and American Schools of Oriental Research.

      e.      At these same institutions, he has held some fifteen committee appointments, including five as committee chair.

      f.      He has held six administrative positions, including his full-time position at Simmons University at the time of trial.

With his two masters degrees, the Debtor believed that he was put in a prime position to get a position in a financially stable church, but that did not happen. He has held positions as chaplain in a hospital and as a minister in various churches, but none of these positions appears to have been full time.

The Debtor believes that as a person of color he encountered prejudice and bias that precluded him from benefitting from his education. He believes, for example, that was the reason that he got relegated to struggling churches, with dwindling memberships or limited incomes. The Court makes no findings as to the Debtor's claims of bias and prejudice against him. The Court does find and credits his testimony that his education did not allow him to maintain consistent income in church or chaplaincy positions to become financially stable. Aside from his monthly income at the time of this bankruptcy filing, his level of remuneration for these positions is not in evidence.

In 2005, three years after his divorce and completion of his doctoral program, he filed

this bankruptcy case. At the time of filing, his most significant debt was his student loan debt. He filed the petition *pro se*, primarily to deal with the student loan debt, erroneously believing that the student loan debt would be discharged because of the filing. The Debtor received a chapter 7 discharge in March 2006. At the time, the Debtor did not commence an adversary proceeding to seek a discharge of his student loan debt. His student loan creditors continued to pursue him and the debt amount grew.

When the Debtor filed this Chapter 7 in 2005, his monthly income totaled $3,285. At that time, his income was derived from four part-time jobs: a chaplaincy; two separate church jobs; and temporary work in a department store. This income was less than his monthly expenses, which totaled $3,348. His expenses did not include rent, since he received housing in exchange for services. The schedule of expenses also did not include any payment on the Debtor's student loans.

The Debtor's income in the four years prior to trial was as follows: $64,729, in 2017, $74,164 in 2018, $91,300 in 2019, and $90,000 in 2020. The Debtor testified that during those years he also had withdrawals from his retirement account that may have been included in the income. The source of income and the tax returns were not submitted in evidence.

**Income As of Trial Date**

At the time of trial, the Debtor was employed by Simmons University with the job title of Director of Academic Integrity. The Court has based its findings on the Debtor's employment at Simmons. As reflected above, after the trial but prior to this decision, the Debtor filed a notice stating his employment had been terminated, but did not seek to reopen the evidence. Accordingly, the Court has not considered the termination of his employment for purposes of this decision.

The Debtor began his job at Simmons on a part-time and temporary basis in January 2019. His job involved revising policies on academic dishonesty and handling cases where students were accused of plagiarism or other forms of academic dishonesty. The Debtor also testified that part of his job was to provide for the transition of such cases to the faculty, including to train the faculty. He was made full time in April 2019 at an annual salary of $90,000. As of the date of trial, he continued to be employed full time at that salary. He worked more than 40 hours each week at his job.

In addition to his salary, the Debtor received other employee benefits including paid holidays, paid sick days, paid vacation time, dental and vision insurance, and health insurance, with a $3,000 family annual deductible. Through his employer, he has a defined contribution retirement account. His employer made contributions to the retirement account. As of July 31, 2020, the employer's contributions to that account totaled $2,700.12 for the year 2020. The Debtor contributed 3% of his salary to the retirement account, which amounts to $112.51 per semimonthly pay period. As of July 31, 2020, the Debtor contributed $1,575.14 to the account for the calendar year 2020. Additional evidence was not submitted regarding other contributions by the Debtor or his employer to the retirement account.

The employer also contributed $2,000 to a health savings account (HSA) on a pretax basis. The Debtor could also contribute to this account from his pretax income. The Debtor had contributed $100 to his HSA for 2020 as of July 31, 2020. He offered no testimony about his annual rate of contribution. The Debtor can use the funds in his HSA to pay his medical expenses.

At the time of trial, the Debtor was paid twice monthly. After withholdings for taxes and for the Debtor's contributions to the employee benefits and retirement, his net income per

semimonthly paycheck was $2,556.82, or $5,113.64 per month.

The Debtor testified that his position would eventually become unnecessary because his job involved training the faculty to take on his responsibilities. However, this testimony alone was insufficient to establish that his position was likely to be terminated soon or at any time certain.

**Monthly Expenses**

The Debtor submitted evidence of his monthly expenses through testimony and exhibits. The Debtor submitted exhibits reflecting his out-of-pocket medical bills (not including prescriptions and over-the-counter medications), his auto repair bills, certain expenditures for his daughters, his tax arrears, and his obligations to repay loans from his two retirement accounts.

The Debtor submitted a chalk that included itemized monthly expenses including rent ($2,350.00), auto insurance ($127.51), utilities ($256.50), groceries/household ($723.00), and other expenses. The Court admitted the exhibit as a chalk only, not as evidence of the expenses, subject to the submission of additional evidence. The Debtor did not submit any documentary evidence regarding such expenses. However, the Debtor testified that he had the expenses itemized in the chalk. While the chalk is not evidence, the Debtor by reference to the chalk testified to having these expenses in the amounts itemized. The testimony is evidence of the expenses in the specified amounts. The Debtor's proof does not fail for lack of evidence of these expenses.

The Debtor owes back taxes, both state and federal. To the Commonwealth of Massachusetts, he was paying his arrears at the rate of $318.40 per month. Assuming no additional interest or penalties, at this rate, this debt will have been paid in full 18 months from the date of trial. He also owes $3,689.07 in federal taxes and was making no payment on this

debt at the time of trial. Assuming no additional interest and penalties, if the Debtor begins payments on the federal taxes at $318.40 per month when the state obligation is abated, it will require at least an additional year of payments.

The Debtor lists as an expense the $117.72 he pays each month to repay loans he has taken against his retirement accounts. The amount of the loans as of the date of trial was approximately $7,700.00. The Court has not included this repayment in determining the Debtor's expenses. The replenishment of a retirement account is a form of savings, not the abatement of a debt. Failure to pay the loans may have tax consequences, but these "loans" are not in fact debts to others.

The Debtor submitted evidence of medical expenses (not including prescription and over-the-counter medication) for himself and one of his daughters totaling $10,443.20, which averages to $1,740.53 per month. The bills and insurance statements are for the roughly six month period from August 15, 2020, through February 18, 2021. These amounts reflect the balance owed by the Debtor for deductibles, co-pays, and the like, after the application of any insurance payments. The Debtor's employment benefits include an employer donation to his HSA of $2,000 per year, which amounts to $166.67 per month that is available to pay these expenses. After application of the $166.67 from the HSA, the medical expenses constituting a drain on his net income are $1,573.86 per month. In Exhibit 11, the Debtor quantified his monthly payments for these expenses at only $147 per month. The Court finds that his proven monthly expenses are in fact $1,573.86 and that most of his medical debt is going unpaid. This is consistent with the fact that some of his evidence of medical debt is in the form of collection letters from bill collectors.

The Debtor contends that prescriptions and over-the-counter medicines cost him on

average $194.44 per month. He testified that he required prescription medications for several medical conditions including high blood pressure, pain control (shoulder, neck, and back), high cholesterol, and acid reflux. In addition, he submitted an exhibit reflecting seven prescription medicines, not including over the counter medications. Based on the evidence, the Court finds that the Debtor incurs such expenses.

The Debtor indicates that he expends $1,204.92 each month on support of his daughters, mostly for educational expenses. Though it is clear that much of this sum is for the younger daughter's undergraduate program, some apparently also is for the older daughter and her graduate studies. Not long before trial, the Debtor paid $5,000 for housing associated with a summer program that is part of the younger daughter's undergraduate program. These funds were borrowed from a retirement account. It is clear that he does what he can to support his daughters in their educational needs and feels a strong parental obligation to do so. Moreover, though the amounts he expends for them leave him unable to address other current obligations as they accrue, he prioritizes the payments for his daughters. ECMC disputes the necessity of these expenditures but not their amount.

By reference to Exhibit 11, the Debtor contends that he has monthly expenses of $127.51 for auto insurance and $300.00 for "gas, oil, upkeep" of his car. The Debtor testified that his automobile was 16 years old at the time of trial and required frequent repairs. The Debtor submitted evidence of bills for automobile repair totaling $1,483.97. The bills confirmed that the automobile was a 2005 Cadillac. Based on the evidence, the Court finds that the Debor incurs such expenses.

By testifying in reference to Exhibit 11, the Debtor confirmed that his monthly expenses include $2,350.00 for rent, $723.00 for "groceries/household," $256.50 for utilities, $58.36 for

"internet, RCN," $5.99 for Roku, $45.00 for Sling, $100.00 for Boost Mobile, $50.00 for

"professional membership/continuing education," $10.00 for bank fees, $10.00 for maintenance

of one of his retirement funds, and $194.25 for miscellaneous expenses. These expenses were not

contested. The Court finds that the Debtor incurs these monthly expenses.

The Debtor also referenced $100.00 for "Retirement/JQ/FR/Nc." The description fails to

provide any explanation as to the nature of the expenses. Since the Debtor also included

miscellaneous expenses that would cover any additional items, the Court will not consider such

expenses.

Based on the foregoing findings, the Court finds that the Debtor had monthly expenses as

of the trial of $7,427.23 as follows:

| | |
|---|---|
| Rent | $2,350.00 |
| Groceries/Household | 723.00 |
| Utilities | 256.50 |
| Internet, Roku, Sling, & Boost Mobile | 209.35 |
| Auto Insurance | 127.51 |
| Auto: Gas, Oil, Upkeep | 300.00 |
| Tax Arrears | 318.40 |
| Support | 1,204.92 |
| Medical Care | 1,573.86 |
| Prescriptions & OTC Medicines | 194.44 |
| Bank Fees | 10.00 |
| Retirement Fund Maintenance | 10.00 |
| Miscellaneous | 194.25 |
| | |
| **TOTAL** | **$7,472.23** |

These monthly expenses exceeded the Debtor's monthly net income of $5,113.64 by

$2,358.59. If the $1,204.92 that the Debtor spends for support of his daughters were not counted

as a valid expenditure, his expenses would still exceed his income by $1,153.67 per month.

Assuming the tax obligations have been met as of the date of this decision, the Debtor still faces

a deficit of at least $835.27 a month. The foregoing is without payment on any student loan

obligations. The Court credits the Debtor's testimony that he lives paycheck to paycheck.

**Debtor's Health**

The Debtor submitted medical records and testified regarding multiple health issues. This evidence was uncontested. As reflected in the medial records and his testimony, the Debtor has several medical conditions that require treatment or monitoring. At the time of trial, the Debor had recently been diagnosed with prostate cancer, which he anticipated would require surgery. The Debtor has a family history of prostate cancer.

The Debtor also has a meningioma that is monitored with an annual MRI to determine whether it has grown and whether surgery is required. Although benign, the mass causes the Debtor to suffer from intermittent headaches that require pain medicine.

The Debtor suffers from cervical disc degeneration and spinal stenosis of the cervical spine, which has shown progression. The disease causes the Debtor great pain in his arm and shoulder and has affected his quality of life, especially because he works at a computer for many hours. He has been required to have physical therapy for this condition. His doctors have advised that he should have surgery to remove damaged vertebrae and repair the damage.

In addition to the foregoing medical issues, the Debtor also suffers from high blood pressure, high cholesterol, gastric reflux disease, an enlarged prostrate, a hernia that may require surgery, and stress due to his financial issues. The Debtor takes seven different prescription medications, in addition to over the counter medicines.

**Future Income**

The Debtor will be 68 years of age by the time of this decision. Despite his health issues, he continued to work at the time of the trial. The Debtor testified that he had no plans to retire but expressed doubt about being able to continue in employment past retirement age. In view of

his age and health issues, the Court finds it unlikely that the Debtor will be able to continue in employment for more than a few years, and probably less. The Court also finds that he is unlikely to increase his income materially in the years that remain until he retires, and that his income at trial is a fair measure of what he can earn.

In retirement, his income will consist solely of social security benefits. No evidence was submitted as to how much these benefits were likely to be. In addition, he will have the benefit of his two retirement accounts, which as of the date of trial held a combined total of approximately $21,200, net of the outstanding loans. He has no other significant assets, liquid or otherwise. At the time of trial, the Debtor's bank accounts were close to zero.

With these limited resources, in retirement the Debtor will have significantly less net income than he has at present. He testified credibly that in retirement, he would no longer be able to afford the relatively high cost of living in the Boston area and likely would have to relocate to a less expensive region. The Court finds that he is unlikely to have surplus income in retirement to fund repayment of his student loans in any amount.

### History of Debt Repayment

The Court has received almost no evidence from either party as to the payments (if any) that the Debtor has made on his student loan obligations since their inception. The one exception is that the Debtor has submitted evidence that in March 2015, a garnishment order had been obtained as to this debt. The Debtor's employer at the time, Andover Newton Theological School, acknowledged that garnishment of the Debtor's salary would begin at the rate of $240.20 per pay period. The frequency of pay periods was not indicated. No evidence has been submitted of the duration of this garnishment or the amount collected by it.

In his posttrial brief, the Debtor seeks a finding that he paid student loan interest

18

payments in 2015 and 2016 of $6,240 per year. The Court cannot so find because no evidence

was submitted at trial of such payments.

### Revised Pay as You Earn Plan

ECMC submitted an exhibit that detailed repayment options, including the Revised Pay

as You Earn Plan ("REPAYE") program. As described in the exhibit and in counsel's

questioning at trial, under the REPAYE program, a student loan borrower makes monthly

payments over 25 years, with the amount determined annually based on the individual's income.

Any remaining balance at the end of the 25 year term would be forgiven. ECMC contends that to

be eligible for REPAYE the loans must be consolidated into the Direct Loan program. ECMC

did not provide any evidence that the Debtor is eligible to consolidate his loans into the Direct

Loan program to be eligible for REPAYE.

At trial, counsel for ECMC asked the Debtor whether he would consider participating in

in the REPAYE program if he was eligible. As part of his questioning, counsel explained that the

Debtor would need to consolidate his federal student loans into the Direct Loan program to

participate in REPAYE. Counsel explained that under this program, based on the Debtor's

income at the time, his repayment obligation would be $330.66 per month. The Debtor

responded that he would not be willing to do so, because (i) "it's unfair to make a person with

my medical condition and my age to pay something up to the day I die" and (ii) "also it's unfair

to force me to pay something I don't owe." Transcript, p 67.

### Effect of Student Loan Debt on Ability to Obtain Credit

The Debtor's student loan debt negatively affects his ability to obtain credit. It

compromised his ability to rent his present apartment. It also affects the rate at which he can

obtain revolving credit.

**ANALYSIS**

Based on the foregoing findings, the Court holds that excepting the debt of ECMC will impose an undue hardship on the Debtor. Given his current and future financial resources, the Debtor cannot maintain a reasonable, minimal standard of living and make payments on the student loans.

As discussed above, the Debtor's financial obligations and employment history has not allowed him in the past or in the present to pay his student loans and meet his basic expenses. Over the course of this period, the Debtor was required to pay support obligations to two children. These obligations have been a significant drain on his resources, which have in most years been meager to begin with. Although the evidence of the Debtor's earning record over his lifetime of employment is incomplete, there is no dispute that at no time have his earnings afforded him sufficient resources to permit payment of his student loans without compromising basic needs. He has often been unable even to house himself and his family.

Looking forward, the Court finds that in view of the Debtor's age and his medical conditions, there is little prospect of his increasing his income materially during his remaining working years. Although the Debtor will no longer have the ongoing obligations for his daughters, the evidence establishes that his present resources would not allow him to meet his expenses for his basic needs. As reflected above, the Court finds that his working years are limited to only a few years given his age and medical issues. In retirement, his income from social security, even supplemented by his meager retirement savings, will become only more insufficient to provide a minimal standard of living. In sum, the Debtor's reasonable future financial resources will not sufficiently cover payment of the student loan debt while still allowing for a minimal standard of living.

ECMC has failed to demonstrate bad faith of the Debtor that would block his ability to obtain a discharge of the student loan debt. ECMC bases its argument of a lack of good faith only on its claim that the Debtor has the ability to resolve his student loan debt through REPAYE but is unwilling to do so. But ECMC failed to demonstrate that the Debtor is eligible for REPAYE, and, if eligible, that the Debtor could make the payments.

In order for REPAYE to constitute a factor in this analysis, the Debtor must be eligible to participate in it. ECMC contends that he is not presently eligible but would become so if he were to consolidate his loans into the Direct Loan program. But ECMC has not provided the criteria for this eligibility, nor demonstrated that the Debtor could meet those requirements. Without knowing those criteria, the Court cannot determine whether the Debtor satisfies them. It is not bad faith for a debtor to be unwilling to participate in an income based program for which his eligibility is not established.

ECMC's reliance on the REPAYE option also fails for the reason that the Debtor cannot afford the payments under such a plan. Given the Debtor's income at trial, ECMC contends the Debtor would be required to pay $330.66 per month, with the payment amount adjusted annually based on his income. But, as discussed in the findings above, the Debtor presently has no surplus income to make a payment in any amount. This situation is unlikely to improve either before or during the Debtor's retirement. Therefore, the burden remains more than he can afford. A debtor's refusal to subject himself to a burden that would make him unable to sustain a minimal standard of living is not bad faith.

**CONCLUSION**

For the foregoing reasons, the Court finds that the debt owed by the Debtor to ECMC imposes an undue hardship on the Debtor and is dischargeable under Section 523(a)(8) of the Code. The Court will enter a judgment in favor of the Debtor consistent with this decision.


Dated:      October 6, 2025                                  By the Court,


_____
Janet E. Bostwick
United States Bankruptcy Judge